(954 P.2d 712)

No. 77,679

No. 77,680

In the Matter of the Estates of W. WALTER STOSKOPF and ALEEN F. STOSKOPF, Deceased.

Opinion filed February 13, 1998.

*Brock R. McPherson, Jeff Lee McVey,* and *Joel D. McMullen,* of McPherson & McVey Law Offices, Chtd., of Great Bend, for appellant.

*Robert L. Feldt,* of Feldt & Roth, P.A., of Great Bend, for appellees.

Before KNUDSON, P.J., PIERRON and MARQUARDT, JJ.

MARQUARDT, J.: Dwight W. Stoskopf appeals the district court's decision to remove him as executor of the estates of W. Walter Stoskopf and Aleen F. Stoskopf.

The Stoskopfs owned and operated a farm in Barton County. The Stoskopfs had three sons—Dwight, Darrel, and Morris. On January 11, 1991, the Stoskopfs gave Dwight a durable power of attorney. Aleen died on December 4, 1994, and Walter died on

December 11, 1994. Both Aleen and Walter appointed Dwight as executor in their wills.

On January 3, 1995, Darrel and Morris petitioned the district court for probate of their parents' wills, requesting that the court deny the appointment of Dwight as executor. The petition alleged that during the period of time Dwight possessed his parents' durable powers of attorney, he

"disposed of [their] assets, purchased land and machinery belonging to [them] at unspecified considerations and never gave an accounting to the petitioners, his brothers. Dwight W. Stoskopf has consistently refused to keep the petitioners informed of his activities as related to managing the assets of [the Stoskopfs]; and . . . recently . . . gave himself a ten year lease on pasture land belonging to petitioner, Morris L. Stoskopf, without Morris L. Stoskopf's consent or knowledge."

Darrel and Morris further alleged that after the district court appointed Dwight as guardian and conservator for the Stoskopfs in 94-GC-23, Dwight was ordered to file with the court a "complete accounting of the financial affairs of the [Stoskopfs] from January 11, 1991, to October 6, 1994" and that Dwight "has bragged to petitioners that he will not provide any accounting regarding his management of the [Stoskopfs'] financial affairs and that they cannot make him do so." On February 2, 1995, the wills were admitted to probate and Dwight was appointed as executor.

On May 18, 1995, Darrel and Morris filed a petition in both estates to remove Dwight as executor, alleging that Dwight "has failed to perform the duties imposed upon him by law and has violated his fiduciary duty to exercise the utmost good faith, honesty and fair dealing in all of his transactions affecting the estates."

On July 13, 1995, a pretrial hearing was held at which the motion to remove Dwight as executor was heard. At that time, Dwight was questioned about his activities in handling the Stoskopfs' affairs before and after their deaths.

Dwight testified that after Walter's death, he stopped making monthly rental payments of $720 to the estate account "[b]ecause [his] dad was dead." In 1992, while acting under the durable powers of attorney, Dwight purchased land from his parents. Dwight told his brothers that he purchased the land for $45,000; however,

the affidavit that Dwight filed with the register of deeds stated that he paid $30,000 for the land, and Dwight testified at the pretrial hearing that the land was a gift.

Dwight testified that his parents loaned him $71,000 in 1986 and that he repaid it, plus $28,000 in interest. However, Dwight does not have any records of the payments made on the loan and does not recall whether the loan payments were made by check or cash. The only indication that payments had been made on the loan is on the Stoskopfs' tax returns from 1986 to 1990, which show that a total of $28,000 in interest was paid. Dwight contends that he made four payments of $11,000 over 4 years and a balloon payment of an unspecified amount in 1990.

During the 4 years that Dwight served as conservator for his parents, he spent $250,000 of their money—checks made payable to Dwight made up approximately $114,000 of that amount. Dwight testified that he used some of this money to pay his parents' caretakers in cash; however, he also testified that some of the caretakers were paid with checks.

In response to an interrogatory requesting information as to what accounts the Stoskopfs had as of January 11, 1991, Dwight stated that his parents maintained accounts at three financial institutions. However, Darrel testified that according to his parents' tax records, they had accounts at five institutions at that time. In another interrogatory response, Dwight stated that all of Walter's farm equipment— three tractors, a couple of fairly large discs, an earth mover, mowing equipment, a grain drill, portable cattle corrals, and a couple of trucks—was disposed of in 1988. Dwight later testified that he purchased the equipment for $10,000 in 1988. However, the Stoskopfs' tax returns contained deductions for equipment repairs in 1989 and tractor repairs in 1990 which were based upon information that Dwight provided to the accountant.

On July 21, 1995, the district court found:

"Because of the serious nature of the allegations and due to the fact that there are some indications and evidence that there were assets available to the estate that are not at this time available to the estate, the Court believes a full and final hearing will need to be held prior to the finalization of the estate."

The district court ordered John Cross to perform a complete accounting of all the bank accounts, stock accounts, equipment, and real and personal property owned by the Stoskopfs since January 1991 so that the court could "make a fair determination as to what should or should not be included within the estate."

On August 14, 1996, a second hearing was held on the motion to remove Dwight as executor. Dwight's counsel objected, stating that he did not know that the motion was to be heard that day. Following a discussion, Dwight's counsel stated, "That's my mistake. Just from reviewing the pleadings, I couldn't tell what date exactly it was supposed to be, and I know we had conversations about it." Dwight's counsel requested a continuance to allow him time to "get copies of all [Cross'] documentation, provide them to [his] own CPA, and be able to go expert to expert against Mr. Cross and come up with some reasonable answers to what's going on here."

The district judge did not continue the hearing and ordered the removal of Dwight as executor, stating:

"I don't think it's decided here at this point and it can't be decided here at this point, without having all the evidence presented, as to whether or not there has been a misappropriation of funds. However, I think there has been raised enough issues that there are some peculiar transactions that have been listed—not peculiar, but transactions that have been listed that are unexplained, and perhaps, most importantly, [Dwight] is unable to explain several records through his statements on the deposition. He is unable to show or provide any documentation, and at this point, I think that there is sufficient enough questions raised that there is a conflict, and I, at this point, am going to remove [Dwight] . . . ."

Dwight appeals, contending that his due process rights were denied because the district court refused to continue the hearing so that a full evidentiary hearing on all issues could be held before he was removed as executor.

The only direction that the Kansas Legislature has given the courts to determine when and how an executor should be removed is set forth in K.S.A. 59-1711:

"Whenever a fiduciary is or becomes an incapacitated person or otherwise incapable of performing the duties of his or her trust, he or she may be removed. Whenever a fiduciary fails or refuses to perform any of the duties imposed upon him or her by law or by any lawful order of the court, he or she may be removed

and his or her compensation may be reduced or forfeited, in the discretion of the court."

The specific due process requirements afforded to an executor prior to removal is an issue of first impression in Kansas. Generally, because removal of an executor is designed to protect the estate, not to punish the executor, the court may proceed in a summary manner. 33 C.J.S., Executors and Administrators § 91, p. 1039. The notice requirements are simply that removal cannot take place until the executor receives notice of the petition to remove and has been given an opportunity to show cause why he or she should not be removed. 31 Am. Jur. 2d, Executors and Administrators § 300. The removal of an executor must be predicated upon facts that are before the court. 31 Am. Jur. 2d, Executors and Administrators § 302.

In the case at bar, two hearings were held. The first hearing was a full evidentiary hearing at which Dwight was given an opportunity to rebut all allegations and evidence presented against him. At the second hearing, additional evidence was presented which tended to support Darrel and Morris' allegations that Dwight had misappropriated the Stoskopfs' assets between 1991 and 1994. Although Dwight was given access to Cross' report and was afforded time to review it prior to the second hearing, his counsel repeatedly objected to its admission, stating that he needed additional time to procure rebuttal expert testimony and to provide "some reasonable answers to what's going on here."

The district court held that additional rebuttal evidence was not necessary because there was sufficient evidence to establish that a genuine conflict existed between Dwight and his brothers. Relying on *In re Estate of Petty*, 227 Kan. 697, 709, 608 P.2d 987 (1980), the district court also held that "sufficient peculiar and abnormal facts [had been] disclosed by the evidence to make it clear that [Dwight] was not a suitable person to handle the estate." The district court did not find it necessary to determine that Dwight had actually misappropriated funds prior to removing him as executor.

Dwight's removal as executor was predicated upon facts legitimately before the court, and Dwight was afforded an opportunity

to be heard at both hearings. The district court's decision to remove Dwight was not based on the issue of whether Dwight had actually misappropriated funds. Therefore, the district court did not abuse its discretion in denying Dwight's request for a continuance to allow him time to procure rebuttal evidence on this issue.

In support of his violation of due process claim, Dwight relies upon *Estate of Wolongavich*, 339 Pa. Super. 452, 489 A.2d 248 (1985), to establish that due process required that he be afforded a full evidentiary hearing at the second hearing. Dwight's reliance upon *Wolongavich* is misplaced.

In *Wolongavich*, the district court removed the executor named in the will following oral argument on the petition and answer. The *Wolongavich* court found that the district court had abused its discretion by failing to hold an evidentiary hearing with sworn testimony. 339 Pa. Super at 457.

Here, the district court did hold an evidentiary hearing with sworn testimony, and Dwight was afforded an opportunity to present rebuttal evidence. Dwight was afforded the due process safeguards set forth in *Wolongavich*. Therefore, the district court's decision to deny Dwight's request for a continuance did not violate his right of due process.

A ruling on a motion for continuance will not be disturbed on appeal unless there is a clear showing of an abuse of discretion. *Wilson v. American Fidelity Ins. Co.*, 229 Kan. 416, 422, 625 P.2d 1117 (1981). "Judicial discretion is abused when judicial action is arbitrary, fanciful, or unreasonable, which is another way of saying that discretion is abused only where no reasonable person would take the view adopted by the trial court." *Simon v. Simon*, 260 Kan. 731, Syl. ¶ 2, 924 P.2d 1255 (1996).

In *Petty*, 227 Kan. at 707, which the district court relied upon in removing Dwight as executor, the Kansas Supreme Court held that

"the mere fact the heirs of the testator have a feeling of hostility toward the designated executor and do not want him appointed is not alone a sufficient reason for a district court to refuse to appoint the designated person. . . . Where, however, the designated person is in a position or has acted in a manner antagonistic toward the interests of the estate or the heirs in a way indicating that his admin-

istration of the estate would probably result in prolonged and unnecessary difficulty or expense, then such a person should not be appointed as executor. *The courts have a duty to see that estates are administered in such a way as to secure a just, speedy, and inexpensive determination of the proceeding.*" (Emphasis added.)

Dwight argues that *Petty* is distinguishable because *Petty* involved the issue of whether a designated executor should have been appointed, not whether an appointed designated executor should be removed.

Dwight correctly points out that *Petty* has not yet been applied to cases involving the removal of an executor. In *In re Estate of Brecklein*, 6 Kan. App. 2d 1001, 637 P.2d 444 (1981), the issue was whether the district court had erred in refusing to appoint a named testamentary trustee. The *Brecklein* court found that it did not need to reach the issue of removal; however, it expressly held that "[a] district court may refuse to appoint *or may remove* a testamentary trustee under exceptional circumstances where friction and controversy have existed and probably would continue to exist between the trustee and the beneficiary." (Emphasis added.) 6 Kan. App. 2d 1001, Syl. ¶ 4.

*Brecklein* also considered the applicability of the holding in *Petty* that

"where a person designated to serve as executor of a will is in a position antagonistic toward the interests of the estate or heirs in a way indicating that his administration of the estate would probably result in prolonged and unnecessary difficulty or expense, then such a person should not be appointed as executor." 6 Kan. App. 2d at 1012.

We hold that *Petty* applies to cases involving the removal as well as the appointment of an executor.

K.S.A. 59-1703 specifies the duties of a fiduciary and states that a fiduciary should not profit from the estate. The evidence presented raises the question of whether Dwight has profited from his parents' estates. At least an appearance of impropriety has been raised by Dwight's failure to maintain records of his financial dealings and to file a court-ordered accounting during the period of time that he was guardian and conservator for his parents. As a result, a conflict has arisen between Dwight and the other heirs

which is likely to continue, thereby causing the administration of the estates to be prolonged and more expensive. Therefore, the district court did not abuse its discretion in removing Dwight as executor prior to determining whether he had actually misappropriated any funds.

Dwight correctly points out that K.S.A. 59-1711, which sets forth the justification for removing or appointing a designated executor, is very limited in its reasons for removing an executor. K.S.A. 59-1711 provides for removal (1) when an executor becomes incapacitated or is otherwise incapable of performing his or her duties or (2) when an executor either fails or refuses to perform any of the duties imposed by law or by order of the court.

Dwight correctly states that the district court did not find that he should be removed as executor pursuant to K.S.A. 59-1711. Dwight argues, therefore, that the district court abused its discretion in removing him as executor.

K.S.A. 59-1711 has not been amended since 1966. *Petty* was decided in 1980 under the same version of K.S.A. 59-1711 as that in effect today. In *Petty*, as in this case, there was no finding that the executor had violated any of the criteria set forth in K.S.A. 59-1711; however, the Kansas Supreme Court still found that the district court had abused its discretion in appointing the designated executor because the appointment resulted in the district court breaching its own duty to "see that estates are administered in such a way as to secure a just, speedy, and inexpensive determination of the proceeding." *Petty*, 227 Kan. at 707.

In light of *Petty*, Dwight's argument that the district court abused its discretion in removing him as executor without first finding that he had failed or refused to perform his duties or the orders of the court is without merit.

Affirmed.